UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 25-1701

BIOAGILYTIX LABS, LLC,

Plaintiff-Appellant,

v.

JAMES MCNALLY; SWORD DIAGNOSTICS, INC.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## **REPLY BRIEF OF PLAINTIFF-APPELLANT, BIOAGILYTIX LABS, LLC**

Melissa L. McDonagh
First Cir. No. 1196996
LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, MA 02110
Telephone:  617.378.6000
Facsimile:   617.737.0052
mmcdonagh@littler.com

James M. Witz
First Cir. No. 1218980
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone: 312.795.3246
jwitz@littler.com

Miguel A. Lopez
First Cir. No. 1218981
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY 10022
Telephone: 212.583.2595
malopez@littler.com

*Attorneys for Plaintiff-Appellant, BioAgilytix Labs, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ............................................................................................................. 2

I.      DEFENDANTS HAVE NOT SHOWN THAT THE TEXT ORDER
        COMPLIES WITH THIS COURT'S APPLICATION OF RULE
        52(A) ........................................................................................................... 2

II.     DEFENDANTS FAIL TO REBUT BIOAGILYTIX'S
        ENTITLEMENT TO A PRELIMINARY INJUNCTION ............................. 7

        A.      Violation of MUTSA ad DTSA ......................................................... 7

        B.      Breach of the Return-of-Documents Provision (Employment
                Agreement § 7) ................................................................................. 12

        C.      Breach of the Customer Non-Solicitation Provisions ...................... 13

        D.      Breach of the Non-Compete Provision ............................................ 14

                1.      The MNAA's Sale-of-Business Exception Applies ............... 14

                2.      The Non-Compete Provision Meets the Formal
                        Requirements of the MNAA ................................................. 18

                3.      Defendants Fail to Show that the Non-Compete Provision
                        is Unreasonable in Scope ..................................................... 20

                4.      Defendants Fail to Rebut BioAgilytix's Showing that
                        McNally is in Breach ............................................................ 21

        E.      The Remaining Factors Favor a Preliminary Injunction ................. 23

CONCLUSION ....................................................................................................... 25

RULE 32(G) CERTIFICATE OF COMPLIANCE .............................................. 26

CERTIFICATE OF SERVICE .............................................................................. 27

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alexander & Alexander, Inc. v. Danahy*,
488 N.E.2d 22 (1986) ...........................................................15, 16, 17

*Applewood Landscape & Nursery Co. v. Hollingsworth*,
884 F.2d 1502 (1st Cir. 1989)...........................................................4, 5

*Automile Holdings, LLC v. McGovern*,
483 Mass. 797 (2020) .......................................................................24

*B & T Masonry Const. Co. v. Pub. Serv. Mut. Ins. Co.*,
382 F.3d 36 (1st Cir. 2004)...............................................................19

*Bio-Imaging Techs., Inc. v. Marchant*,
584 F. Supp. 2d 322 (D. Mass. 2008)................................................22

*Carroll v. Mitsubishi Chem. Am.*,
No. CV 21-11801-JCB, 2022 WL 16573974
(D. Mass. May 19, 2022) ..............................................................17, 18

*Commonwealth v J.F.*,
491 Mass. 824 (2023) .......................................................................15

*Commonwealth v. Williamson*,
462 Mass. 676 (2012) .......................................................................14

*Corp. Techs., Inc. v. Harnett*,
731 F.3d 6 (1st Cir. 2013)..................................................................13

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
795 F.Supp. 501 (D. Mass. 1992)......................................................11

*Dermody v. Exec. Off. Of Health & Hum. Servs.*,
491 Mass. 223 (2023) .......................................................................19

*Frazier v. Prince George's Cnty., Maryland*,
86 F.4th 537 (4th Cir. 2023) ............................................................5, 6

*Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Serv., LLC*,
707 F. Supp. 2d 92 (D. Mass. 2010)..................................................23

*Kroeger v. Stop & Shop Cos.*,
13 Mass. App. Ct. 310 (1982)..............................................................................24

*Maine Point, LLC v. Collins*,
No. 18-12072-DJC, 2018 WL 5303038 (D. Mass. Oct. 25, 2018) .....................8

*Nuance Commc'ns, Inc. v. Kovalenko*,
No. 22-cv-10656, 2022 WL 2347112 (D. Mass. June 29, 2022) .......................21

*Ooyala, Inc. v. Dominguez*,
No. CV 17-10943-GAO, 2018 WL 3360759
(D. Mass. July 10, 2018)...................................................................................11

*Phillips v. Pembroke Real Estate, Inc.*,
459 F.3d 128 (1st Cir. 2006)..............................................................................15

*TEC Engineering Corp. v. Budget Molders Supply, Inc.*,
82 F.3d 542 (1st Cir. 1996)..................................................................................3

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339 (1st Cir. 2024)...............................................................................4

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
No. CV 23-12116-LTS, 2023 WL 8367730
(D. Mass. Oct. 27, 2023).....................................................................................4

*U.S. v. Slade*,
980 F.2d 27 (1st Cir. 1992).................................................................................19

*U.S. v. Zannino*,
895 F.2d 1 (1st Cir. 1990)..................................................................................12

**Statutes**

M.G.L. c. 93 § 42 ...................................................................................................8

M.G.L. c. 149, § 24L(a) ..............................................................................14, 15, 19

M.G.L. c. 149, § 24L(b)(iii)...................................................................................20

M.G.L. c. 149, § 24L(c) .................................................................................18, 19

**Rules**

Fed. R. Civ. P. 52(a) ............................................................................*passim*

**Other Authorities**

*Frazier v. Prince George's Cnty., Maryland*,
  D. Md., No. 8:22-cv-01768-DKC, Dkt. No. 105 (Mar. 2, 2023) ........................6

# PRELIMINARY STATEMENT

The Joint Brief of Defendants-Appellees' James McNally and Sword Diagnostics, Inc. ("Defendants' Opposition" or "Appellees' Br.") fails to explain how the District Court's Text Order satisfies this Court's guidance regarding compliance with Federal Rule of Civil Procedure 52(a). The cases relied upon by Defendants make clear that a district court must make factual determinations as to each claim at issue – and, indeed, as to each element of each claim. BioAgilytix does not suggest that the Text Order should be vacated because it fails to weigh in on every factual dispute raised by the parties. BioAgilytix asks that the Text Order be vacated because it entirely ignores all but one of BioAgilytix's claims (breach of the customer non-solicitation provisions). The District Court's failure to comply with Rule 52(a) punts the responsibility to adjudicate the matter before it to this Court. Affirming the Text Order would set a dangerous precedent permitting district courts to pass on complex or difficult questions in the hope that those questions will sort themselves out without the need for judicial intervention. The Text Order should be vacated.

Defendants' Opposition also fails to rebut BioAgilytix's showing that it is entitled to a preliminary injunction. Like the District Court, Defendants ignore unrebutted evidence and settled law regarding the import of those facts in deciding a preliminary injunction motion. Defendants make sweeping statements about the

record that are patently false. Defendants argue that certain issues are not contested – when in fact their own witnesses submit only conclusory *ipse dixit* statements in opposition to BioAgilytix's forensic evidence and detailed fact witness testimony. Defendants misstate or ignore well-settled law regarding, among other things: (1) the elements of a claim under the MUSTA or DTSA; (2) this Court's holdings regarding evidence of client solicitation; (3) the formal requirements of the MNAA; (4) whether companies of qualitatively different sizes can be found to be competitors (they can and regularly are); and (5) the irreparable harm stemming from misappropriation of trade secrets or breach of a non-competition provision.

## ARGUMENT

### I. DEFENDANTS HAVE NOT SHOWN THAT THE TEXT ORDER COMPLIES WITH THIS COURT'S APPLICATION OF RULE 52(A)

Compliance with Rule 52(a) is not an empty formality, but rather a basic requirement that protects against what occurred in this case – a dereliction of judicial duty. A holding that the Text Order's passing reference to the preliminary injunction standard is sufficient to satisfy Rule 52(a) would have dire consequences beyond this litigation. Rule 52(a) underscores the district court's duty to actually decide the disputes before it. Without this requirement, district courts would be free to pass on substantive decisionmaking, and place that burden on the appellate courts in the first instance. Nothing about this Court's decisions to date gives cover to the District Court's dereliction in this case.

The decisions relied upon by Defendants establish that the Text Order fails this Court's test for compliance with Rule 52(a). Most instructive is *TEC Engineering Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542 (1st Cir. 1996), which vacated and remanded a grant of preliminary injunction. This Court wrote, of the district court in that case: "In its three-page written order, the court merely recited the traditional four-prong preliminary injunction test and summarily stated that TEC had met its burden in establishing it." *Id.* at 545. At issue in that case was whether the Defendants had violated section 43(a) of the Lanham Act. *See id.* at 545-46. The Court recited the three factors for establishing that claim, and held that "[i]n addressing TEC's likelihood of success, the district court should make subsidiary findings of fact and conclusions of law sufficient to explain its evaluation of the evidence with respect to each of these three factors." *Id.* at 546.

*TEC Engineering Corp.* mandates that the Court should vacate the Text Order, with instructions to specifically address each of Plaintiffs' underlying claims. As in *TEC Engineering Corp.*, the Text Order here does no more than cite "the correct standard governing the issuance of a preliminary injunction." Appellees' Br. at 26. As explained in BioAgilytix's opening brief, the District Court should have made findings as to each element of a DTSA and MUTSA claim, and each factor in determining the enforceability of the restrictive covenants at issue. It did none of that.

The other decisions cited by Defendants likewise make clear that the District Court should have ruled on each underlying claim. A ruling on BioAgilytix's overall request for a preliminary injunction is not enough. In *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339 (1st Cir. 2024), the Court held that the district court's opinion "serve[d] the core purpose of Rule 52(a). . . . It makes pellucid the court's findings and reasoning *on each disputed issue*." *Id.* at 352 (emphasis added). The district court in that case issued a seven-page decision in which it devoted: (i) an entire paragraph explaining the five elements of a trademark infringement claim; (ii) a likelihood-of-success analysis that included an entire paragraph for each of those five elements; (iii) nearly one-and-a-half pages addressing the movant's arguments and explaining why they were not successful. *See US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, No. CV 23-12116-LTS, 2023 WL 8367730, at *1 (D. Mass. Oct. 27, 2023). The Text Order does none of that.

In *Applewood Landscape & Nursery Co. v. Hollingsworth*, 884 F.2d 1502 (1st Cir. 1989), this Court stated that "the 'judge need only make brief, definite, pertinent findings and conclusions *upon the contested matters*.'" *Id.* at 1503 (emphasis added) (citing Fed. R. Civ. P. 52(a), advisory committee's note to 1946 Amendment). Again, the "contested matters" – plural – referred not to the bench trial as a whole, but to the underlying contract questions in dispute. Specifically: "The question in

the Applewood case was why so many of the trees and shrubs that Applewood bought were of poor quality and why the lawn that he laid, in large part, had to be replaced later by another company." *Id.* at 1504. The district court made factual determinations in response to each of those matters. *See id.* at 1504-05. The Text Order, by contrast, makes no factual determination whatsoever, aside from characterizing as "[r]ather thin gruel" one piece of evidence in support of one aspect of one of claim. (ADD 2.)

Finding that the Text Order complies with Rule 52(a) would be a radical departure not just from this Court's precedent, but from that of its sister courts. In *Frazier v. Prince George's Cnty., Maryland*, 86 F.4th 537 (4th Cir. 2023), the Fourth Circuit vacated and remanded a decision denying preliminary injunctive relief where, as here, the district court simply chose not to undertake the work required of it. The District Court here alluded to the likelihood-of-success factor (without specifically identifying it), but "spoke in broad strokes" and – with the possible exception of BioAgilytix's non-solicitation claim – it did so "without identifying material facts that were unclear or ambiguous." *Id.* at 545. The District Court stated that "'maybe' does not support the entry of injunctive relief." (ADD 2.) But a "[c]onclusory statement about the lack of a record and the existence of factual uncertainty cannot suffice under Rule 52(a)(2)." *Frazier*, 86 F.4th at 545.

The record in *Frazier* suggests that the district court there did not feel it was efficient to engage in preliminary injunction proceedings when the matter might be resolved without the need for doing so. At the telephonic hearing, the district court said: "Look, I don't need to spend a lot of time on this." Tr. of Telephonic Proceedings, *Frazier v. Prince George's Cnty., Maryland*, D. Md., No. 8:22-cv-01768-DKC, Dkt. No. 105 (Mar. 9, 2023), Tr. at 13:14. Later, the court concluded: "Frankly, we will get much closer to a resolution, a final resolution of this case if we don't have a preliminary injunction intervening." *Id.*, Tr. at 15:23-25. In the case at bar, the District Court's handful of interventions at the preliminary injunction hearing suggest that it, too, thought the parties would be able to resolve at least their trade-secret and return-of-documents dispute without the need for a ruling on that claim:

> THE COURT: Well, with respect to the computer evidence, if you want to call it that, somewhere in the papers I read the defendant said it was suggested a third-party examiner. What would your reaction to that be?
>
> MR. WITZ: We want a third-party examiner, your Honor. We're okay with a third-party examiner. That's what we've suggested, is that a forensic neutral with a protocol go into the devices and look for our information to see evidence of what was used or copied.
>
> THE COURT: So to the extent there's disagreement, it is just about the scope of the inquiry?
>
> MR. WITZ: I'm not sure that there is –

> THE COURT: Rather than the fact of the examination?
>
> MR. WITZ: I don't believe that there was a difference on the fact of the examination, your Honor. They can tell me otherwise, but when we were talking, I think that -- I mean, it's a contractual requirement, and they've given no excuse for why they shouldn't abide by the contractual requirement.

(JA 616-617.) Counsel for BioAgilytix was referring to Section 7 of McNally's Employment Agreement, which is discussed at Section II(B), *infra*. *See also* Br. at 46. Following the District Court's denial of preliminary injunction, Defendants have not agreed to any forensic review, and none has taken place. The District Court's complacence has imperiled, and continues to imperil, BioAgilytix's property rights.

Defendants have not cited any decisions in which an appellate court found that a decision as bare bones as the Text Order satisfied the requirements of Rule 52(a). Its attempts to distinguish the Text Order from the decisions cited by BioAgilytix do not put it in a different category from those decisions, and does not make the Text Order compliant with this Court's Rule 52(a) case law.

## II. DEFENDANTS FAIL TO REBUT BIOAGILYTIX'S ENTITLEMENT TO A PRELIMINARY INJUNCTION

### A. Violation of MUTSA ad DTSA

Defendants' Opposition almost entirely ignores the record in support of BioAgilytix's trade secret claims. At the outset, Defendants cite the wrong standard for the showing required to prevail on a trade secret claim under MUTSA and DTSA. Defendants argue that a plaintiff must "show that the defendant intended to convert

the documents to his own use." *See* Appellees' Br. at 32. They cite *Maine Point, LLC v. Collins*, No. 18-12072-DJC, 2018 WL 5303038 (D. Mass. Oct. 25, 2018), for that proposition. That decision denied a preliminary injunction motion brought under MUTSA's *predecessor law*, Mass. Gen. L. c. 93 § 42 (2017), an entirely different statute which required a showing that the defendant had an "intent to convert to his own use, any trade secret." *Id.* at *4. That statute was superseded by the MUTSA on October 1, 2018. Neither MUTSA nor DTSA require a showing that the defendant has an "intent to convert" the trade secret to his own use. The practical effect is that, under the DTSA and MUTSA, a plaintiff need not have secured difficult-to-obtain proof of *use* before seeking injunctive relief. The defendant's improper acquisition of the trade secret is a sufficient basis for a court to infer that the improperly acquired trade secret will be put to improper use.[1]

BioAgilytix addressed McNally's improper acquisition of its trade secrets in Section III.A.1(c) of its appellate brief. *See* Br. at 30-37. Defendants' Opposition does not address these arguments at all. *See* Appellees' Br. at 32-34. Nor did their

---

[1] Defendants also argue that "[w]ithout a showing of even opportunity or motive to appropriate BioAgilytix's confidential business information, BioAgilytix could not succeed on a claim of misappropriation." Appellees' Br. at 34 (citing *Network Sys. Architects Corp. v. Dimitruk*, No. 06-4717-BLS2, 2007 WL 4442349, at *8 (Mass. Super. Dec. 6, 2007)). This is not a required element of a trade secret claim. The proposition cited by Defendants concerned an element of a claim for intentional interference with contractual relations.

opposition papers to the District Court below. (SSJA 33-068.) Defendants' bald-facedly argue that "BioAgilytix presented no evidence" that McNally had BioAgilytix's trade secrets. Appellees' Br. at 32. This is knowingly false. As explained in its opening brief, BioAgilytix's forensic expert identified BioAgilytix data on three USBs that remain in McNally's possession, as well as evidence of at least one BioAgilytix document on McNally's Google Drive. *See* Br. at 30-37. The Declaration of BioAgilytix's COO, Linda Robbie, describes each of these documents and provides the basis for finding that they constitute trade secret material under the DTSA and MUTSA. (JA 60-70 ¶¶ 35-91.) Defendants do not discuss these documents at all.

Defendants do refer sweepingly to the documents that McNally accessed during his notice period and which BioAgilytix maintains he accessed without any legitimate purpose. *See* Appellees' Br. at 33-34. They argue that the documents "appear on their face to contain, in majority part, information that is either in the public domain or was otherwise available to the public on BioAgilytix's website." *Id.* at 33; *see also id.* at 16 (citing JA 490-491 ¶¶ 19, 21-28, 78). Of the twenty-four documents in this category, McNally only specifically claimed that *one* document ("Available Off the Shelf Assays") contained public domain material. (JA 491.) As explained in BioAgilytix's opening brief, BioAgilytix's COO rebutted his assertion as to that one document specifically, and as well as to his general denial that

BioAgilytix does not own proprietary information. (JA 545.) BioAgilytix's specific assertions as to the remaining documents remain entirely unrebutted. Defendants' statement that "BioAgilytix provided only conclusory statements without actual evidence that the accessed documents at issue constituted trade secrets," is therefore knowingly false.

Next, Defendants also repeatedly misstate the record rather than admit that McNally failed to rebut BioAgilytix's evidence of suspicious computer activity. Defendants assert that the suspicious computer activity "was directly disputed by Dr. McNally's affidavit." Appellees' Br. at 16-17 (citing JA 487-506). Yet McNally's affidavit entirely ignores the evidence showing he remotely accessed three personal computers from his BioAgilytix laptop hundreds of time between July 30, 2024 and his final day of employment on February 7, 2025 (JA 85), including thirteen times following his resignation. (JA 103-112.) That evidence is undisputed, and his failure to address reinforces the inference of improper conduct. As explained by BioAgilytix's forensic expert, the only way to determine what files were transferred to remote computers using Google Remote Desktop would be to examine those computers. (JA 539.) There is no reason not to grant that relief.

Defendants assert "there is no dispute that BioAgilytix directed Dr. McNally to generally continue working as he otherwise would." *Id.* at 16. That is false. BioAgilytix presented evidence that McNally was disinvited from key meetings and

that his travel was cancelled. (JA 135, JA 523.) BioAgilytix's COO and another colleague whom McNally mentions in his affidavit both submitted declarations denying his assertions that they asked him to perform work related to BioAgilytix's board of directors meeting during the time period he was accessing those highly sensitive and confidential materials. (JA 523, JA 600.)

Defendants incorrectly assert that "the Preliminary Injunction Motion was completely void of any allegation that Sword Bio was in possession of" BioAgilytix's trade secrets. Appellees' Br. at 34. Sword Bio is itself in possession of the trade secrets by virtue of McNally's possession. *See Ooyala, Inc. v. Dominguez*, No. CV 17-10943-GAO, 2018 WL 3360759, at *6 (D. Mass. July 10, 2018) ("Brightcove argues that it did not encourage this misappropriation and, therefore, cannot be held responsible for the conduct of its employees, but that is precisely what Massachusetts trade secret law allows."); *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 795 F.Supp. 501, 507 (D. Mass. 1992) ("Under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret."). McNally is Sword Bio's Chief Science Officer, the at-issue trade secrets relate directly to the work of his office, and – as explained by BioAgilytix's COO on a document-by-

document basis – would benefit Sword Bio to BioAgilytix's detriment. (JA 60-70 ¶¶ 35-91.)

### B. Breach of the Return-of-Documents Provision (Employment Agreement § 7)

Defendants do not at all address BioAgilytix's claim that McNally is in breach of the return-of-documents provision at Section 7 of his Employment Agreement.[2] They have therefore waived any opposition to BioAgilytix's position that it is likely to succeed on the merits of that claim. *See U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that issues "unaccompanied by some effort at developed argumentation [] are deemed waived."). That provision states, in pertinent part:

> Upon the Company's request, Employee will submit all personal computers, phones and other devices or accounts which s/he used for Company business, and identify all personal accounts and related passwords, to a third-party vendor, as may be designated by the Company, for inspection and removal of any Company-related information, including without limitation Proprietary Information.

This Court should therefore remand with instructions for the District Court to enter the relief ordered at Paragraph 3 of the proposed order submitted with its preliminary injunction motion. (JA 52-54.)

---

[2] *See* Br. at 46-48 for BioAgilytix's discussion of that provision on appeal.

## C.    Breach of the Customer Non-Solicitation Provisions

Defendants again fail to rebut BioAgilytix's likelihood of success in showing that McNally breached his customer non-solicitation obligations. Defendants devote one paragraph to these claims, and in it ignore entirely the most compelling evidence of McNally's breach. *See* Appellees' Br. at 40. Defendants aggressively and indiscriminately solicited the attendees of an industry conference to speak with McNally about Sword Bio's offerings. (*See* JA 581-596; *see also* JA 59, 60, 137, 523, 551). This Court has held that an employer's customer non-solicitation "right cannot be thwarted by easy evasions, such as piquing customers' curiosity and inciting them to make the initial contact with the employee's new firm." *See Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 8 (1st Cir. 2013) (affirming preliminary injunction). As BioAgilytix explained in its opening brief, that is precisely what Defendants did when they invited the attendees at a series of industry conferences to speak with McNally, specifically, about Sword Bio's services.

Defendants, like the District Court, also ignore entirely this Court's holding that where "the sales process is complex and the products are customized . . . initial contact is likely to weigh far less heavily." *Corp. Techs., Inc.*, 731 F.3d at 11. They likewise ignore that BioAgilytix's COO detailed the months-long sales cycle for CRO services. (JA 546.) Given the foregoing unrebutted record evidence, McNally

should have been preliminary enjoined from violation of Section 6 of the Employment Agreement and Section 5 of the Support Agreement.

### D. Breach of the Non-Compete Provision

Defendants' argument in opposition to enforcement of the non-compete provision asks this Court to make novel conclusions about state law, and to make factual determinations that ignore the appellate record. It would be improper for this Cour to do either.

### 1. The MNAA's Sale-of-Business Exception Applies

Under existing Massachusetts law, McNally was a "significant owner" of BioAgilytix at the time he agreed to the Support Agreement. The MNAA states that the sale-of-business exception applies "when the party restricted by the noncompetition agreement is a significant owner of, or member or partner in, the business entity *who will receive significant consideration* or benefit from the sale or disposal." M.G.L. c. 149, § 24L(a) (emphasis added). Section 24L(a) itself explains who is a significant owner: one "who will receive significant consideration" from the sale. *See Commonwealth v. Williamson*, 462 Mass. 676, 679 (2012) ("[T]he Legislature intended what the words of the statute say."). As explained in BioAgilytix's opening brief, McNally received significant consideration from the sale: $1.4 million in cash, and $1.55 in rollover securities. *See* Br. at 5 (citing JA 134-135, JA 550, JA 492-493.).

Defendants ask this Court to read into Section 24L(a) a proportionality test whereby the significance of McNally's consideration is weighed in relation to the overall proceeds of the sale. There is no legal basis for doing so. Indeed, doing so would be contrary to existing law. To the extent ambiguous, the text of the MNAA should be read in the context of Massachusetts common law. *See Phillips v. Pembroke Real Estate, Inc.,* 459 F.3d 128, 142 (1st Cir. 2006) ("[S]tatutes which invade the common law are to be read with a presumption favoring retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident . . . [T]o abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.") (citing *U.S. v. Tex.*, 507 U.S. 529, 534, 113 S. Ct. 1631, 123 L. Ed. 2d 245 (1993)); *Commonwealth v J.F.*, 491 Mass. 824, 836 (2023) ("In interpreting a statute, we presume that when the Legislature enacts a law it is aware of the statutory and common law that governed the matter in which it legislates"). In *Alexander & Alexander, Inc. v. Danahy*, 488 N.E.2d 22 (1986), the Appeals Court of Massachusetts considered whether a restrictive covenant agreement was entered in the context of a sale-of-business or was an ordinary employment agreement. The court reasoned:

> True, it was the good will of KIA which was sold, and that good will may have diminished to some extent over the years following the dissolution of that corporation. Nevertheless, Danahy's association with A & A during those years must have meant that some of KIA's good will remained. Moreover, the usual inequality of bargaining

15

power between employer and employee was not present when these noncompetition covenants were entered into. The proceeds of the sale provided an ample cushion for Danahy for the period during which the covenant was to be in effect, whether that period be the five years immediately following the sale or some five-year period after Danahy's employment with A & A ceased. In short, the covenants not to compete were treated as an integral part of the agreement for the sale of the business, and there is no reason for us to view them as something other than what they purport to be.

*Id.* at 29.

The *Alexander & Alexander* court's analysis did not turn on Danahy's position as a majority shareholder. It considered Danahy's significance in relation to the business's good will. As Chief Scientific Officer and part of BioAgilytix's senior leadership team, with a customer-facing role (JA 17; JA 132-133; 543-545), McNally's role was integral to BioAgilytix's good will. Indeed, McNally's relationship to BioAgilytix's sale value is even greater if his false assertion regarding BioAgilytix's lack of proprietary scientific information (*see* JA 490 ¶ 19) were taken as true. In examining Danahy's consideration resulting from the sale, the *Alexander & Alexander* court noted that it "provided an ample cushion." That is a qualitative test. Danahy received $1.5 million in stock, *see* 488 N.E.2d at 25, while McNally received $1.55 million in stock, plus $1.4 million in cash. In summing up its analysis, the *Alexander & Alexander* court recognized that if the restrictive covenants were

"*treated* as an integral part of the agreement for the sale of the business," the court should likewise treat them as such. *Id.* at 29. So too here.

At least one court within the First Circuit has applied the principles of *Alexander & Alexander* to a sale-of-business agreement entered after the effective date of the MNAA. In *Carroll v. Mitsubishi Chem. Am.*, No. CV 21-11801-JCB, 2022 WL 16573974 (D. Mass. May 19, 2022), the plaintiff sued for the garden-leave payments specified in her non-compete agreement. *Id.* at *1. That agreement was executed in connection with the sale of her prior employer, of which she was a shareholder. *Id.* at *1. The defendant moved to dismiss, arguing that the agreement was unenforceable under the MNAA because the non-compete period exceeded 12 months. *Id.* at *3. The court disagreed, reasoning:

> The MNAA does not define the terms "significant owner" and "significant consideration." Carroll has alleged, however, that she was a shareholder of AdvanSource and that in order to consummate the transaction between MCA and AdvanSource, MCA requested that Carroll enter into a Voting and Support Agreement in which she agreed to use the voting rights she had through her shares in AdvanSource to vote in favor of the Sale. Complaint at ¶¶ 6, 7. Viewing those facts in the light most favorable to Carroll, and making all reasonable inferences in her favor, as this Court must at this stage, those allegations plausibly suggest that her interests in AdvanSource were significant enough that MCA needed her vote in order to consummate the Sale.

*Id.* at *4. There is no suggestion in *Carroll* that the plaintiff's ownership share of AdvanSource was even as large as McNally's ownership share of BioAgilytix. The

court held that the plaintiff's ownership could be "significant" because her prior employer required that she vote in favor of the sale. That, again, is a qualitative test. Here, the Support Agreement expressly states, that: "the covenants and agreements set forth in this Agreement are a material inducement to, *and a condition precedent of*, Buyer to consummate the transactions contemplated by the Merger Agreement." (JA 150) (emphasis added). McNally was one of just 19 employees out of 827 who were asked to sign a Support Agreement, *see* (JA 550 ¶ 10), a fact that Defendants do not dispute. As with the plaintiff in *Carroll*, McNally was a significant owner because this particular transaction would not have been completed without his agreement.

### 2. The Non-Compete Provision Meets the Formal Requirements of the MNAA

Even if the Support Agreement were subject to the MNAA, Defendants' argument that it fails to meet the MNAA's formal requirements is baseless. Without citation to the record, Defendants argue that the Support Agreement does not satisfy the MNAA's notice requirement. (Appellees' Br. at 38). As explained in BioAgilytix's opening brief, it provided far more notice than the ten days required by statute. *See* Br. at 39 (citing JA 549, JA 560, JA 550). Next, Defendants argue that the Support Agreement is invalid because the non-compete provision "purported to apply in the not-for-cause termination contexts." (Appellees' Br. at 38). That restriction is in subsection (c) of Section 24L, which begins, "A noncompetition

agreement shall not be enforceable against" – meaning the restriction is applied to an employer's attempt to enforce the non-compete in the specified contexts, not a requirement related to the drafting or administration of the agreement. *See* M.G.L. c. 149, § 24L(c). If the Legislature wanted a non-compete contract to state the non-compete would not be enforced unless the employee was terminated for cause or resigned, then the Legislature would have included that requirement and placed it in subsection (a) of Section 24L, but it did not. *See Dermody v. Exec. Off. Of Health & Hum. Servs.*, 491 Mass. 223, 230 (2023) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Finally, Defendants argue that the non-compete provision is invalid because the Support Agreement was purportedly not signed by McNally's employer. (Appellees' Br. at 38-39). Defendants raise this argument for the first time on appeal. The argument should be rejected on that basis alone. *See B & T Masonry Const. Co. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 40 (1st Cir. 2004) (rejecting argument that "the raise-or-waive rule should not apply because it is not advancing a new *issue* on appeal, but merely a new *argument*"); *U.S. v. Slade*, 980 F.2d 27, 31 (1st Cir. 1992) (applying the "raise-or-waive rule" and explaining that "a party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court").

Defendants might argue that an exception to the raise-or-waive rule is warranted because the decision cited in their Opposition was decided on September 11, 2025 – after the date of the Text Order. Not so. That decision merely interprets the MNAA's textual requirement that the agreement "be signed by both the employer and employee." M.G.L. c. 149, § 24L(b)(iii). That text existed at the time of Defendants' written submissions and oral arguments to the District Court. In any event, Defendants' assertion that the Support Agreement's signatories were "entirely separate entities" from McNally's employer at the time of execution is a fact issue not at all resolved by the signature pages that Defendants cite in support of their argument. *See* JA 163-164. After all, the BALX Holding, LLC signature page is signed by Jim Datin, and lists his title as "President & Chief Executive Officer." (JA 163.) Jim Datin, Chief Executive Officer, signed McNally's Employment Agreement. (JA 148.)

### 3. Defendants Fail to Show that the Non-Compete Provision is Unreasonable in Scope

Defendants argue that the non-compete provision is unreasonable in scope because it "would have effectively banned Dr. McNally from working in the industry that he has worked in for the past twenty-years prior to joining BioAgilytix." (Appellees' Br. at 37.) It's no wonder that Defendants do not cite the record in support of their assertion. McNally could have worked at literally any of his prior employers (or any of *their* competitors) without violating the non-compete

20

provision, because BioAgilytix was the first CRO for which McNally ever worked. *See* Br. at 49-50 (citing JA 132 ¶ 4); *see also* JA 488 ¶ 6 (McNally describing his "interactions [*i.e.*, not employment] with Contract Research Organizations ("CROs"), such as BioAgilytix and other such companies" prior to joining BioAgilytix). Defendants also cast BioAgilytix's argument for enforcement as resting on an application of the inevitable disclosure doctrine. *See* Appellees' Br. at 37. It does not. Enforcement of the non-compete provision is necessary to protect BioAgilytix's legitimate interest in its confidential information because McNally has *actually* misappropriated such information, and it can be *inferred* that he did so in order to use it at Sword Bio.

### 4. Defendants Fail to Rebut BioAgilytix's Showing that McNally is in Breach

If the non-compete provision is enforceable, McNally is in breach of it. Defendants offer no legal or legitimate factual basis for asserting that BioAgilytix and Sword Bio are not competitors. *See* Appellees' Br. at 39-40. There is no legal support for the proposition that companies of different employee headcounts or valuations do not compete with each other. In fact, the opposite is true. The case law within the First Circuit (as elsewhere) is replete with examples in which a non-compete is enforced against an established company's former employee who has gone on to work at a start-up competitor or even to start his own business. *See, e.g.*, *Nuance Commc'ns, Inc. v. Kovalenko*, No. 22-cv-10656, 2022 WL 2347112, at

*6, (D. Mass. June 29, 2022) (enforcing non-compete against former employee who joined a "development stage company" because his "association with a competing product would be enough to raise doubts in the eyes of [the plaintiff's] customers as to the relative value of [the plaintiff's] products" even where the new employer had "no customers" and the employee's job "[was] not customer facing"); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 329 (D. Mass. 2008) (rejecting argument the defendant did not work in competitive position because his new employer was "focuse[d] on smaller clinical trials" rather than pharmaceuticals and enforcing non-compete provision against the former employee under New Jersey law).

Again, Defendants assert – without any support – that BioAgilytix and Sword Bio service different segments of the market. *See* Appellees' Br. at 40. At the District Court, Sword Bio's CEO made this conclusory assertion in his affidavit in opposition to the Motion. *See* (JA 508-509.) BioAgilytix's CEO rebutted that assertion. *See* (JA 520.) Defendants could not actually make anything more than a conclusory (and false) assertion in this regard. After all, the fact of at least one common customer (Moderna) was a major point in the record below. *See* JA 59, JA 497-498, JA 551, JA 582-584.

### E. The Remaining Factors Favor a Preliminary Injunction

Defendants' brief argument regarding the balance-of-harms and public-interest factors rehashes inapposite citations without addressing the points raised in BioAgilytix's brief. *See* Appellees' Br. at 40-41. For example, BioAgilytix previously distinguished *Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Serv., LLC*, 707 F. Supp. 2d 92 (D. Mass. 2010), a decision relied on by Defendants below to give weight to McNally's false assertion that he was misled about the enforceability of the non-compete provision. *See* Br. at 48. Again, in that case, plaintiff wrote in a letter to a former sales employee "we are not intending to enforce the non-compete at this point" after the former employee left plaintiff to work for a competitor. *Iron Mountain Info. Mgmt., Inc.,* 707 F. Supp. 2d at 110. Here, the opposite is true. BioAgilytix's CEO emailed McNally on January 28, 2025, to state, among other things:

> 5. **Contractual Obligations:** As a reminder, your contractual obligations include noncompete, non-solicitation (of both clients and employees), and non-disparagement clauses. BioAgilytix expects and will enforce compliance with these terms.

(JA 524). As for his assertion that a Human Resources officer told him the Support Agreement's non-compete would be unenforceable in Massachusetts – that assertion would be irrelevant even if true. First, McNally could have – and surely did – ask *his own counsel*, who secured for him a reduction in the scope of the non-compete

provision. *See* JA 560 (email); JA 566-567 (redlines). Second, the Support Agreement states that it and the accompanying Merger Agreement documents constitute the "complete agreement among the parties hereto with respect to the transactions contemplated hereby and thereby and supersede all prior agreements and understandings among the parties hereto with respect thereto." (JA 158 § 14).

Defendants' remaining argument does not go to the public interest or balance-of-harms, but to the extent which restrictive covenants should be enforced, generally. In both of those cases, the courts *did* enforce the restrictive covenants, and tailored the extent of the relief according to the facts of the case. *See Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 808 (2020) (affirming enforcement of anti-raiding covenant); *Kroeger v. Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 312 (1982) (enforcing non-compete provision for one year).

BioAgilytix will continue to experience irreparable harm so long as McNally is in possession of BioAgilytix's trade secrets and is providing critical services to Sword Bio during what should be his non-competition period. The public interest in enforcement of paid contractual obligations and the protection of trade secrets and third-party confidential information remains unrebutted. Permitting the Text Order to remain in place would only weaken public trust in the ability of employers to invest in their employee. It would also weaken confidence that public or private investors can depend on trade-secret and contract laws to safeguard their support for

valuable enterprises. By contrast, the only party to benefit from affirming the Text Order is McNally and – in the immediate-term only – Sword Bio.

## CONCLUSION

BioAgilytix respectfully requests that this Court vacate the Text Order for failure to comply with Fed. R. Civ. P. 52(a), and remand this matter with instructions for the District Court to enter a preliminary injunction appropriately tailored to the facts.

Respectfully submitted,

BIOAGILYTIX LABS, LLC,

By its attorneys,

/s/ Miguel A. Lopez

Miguel A. Lopez, First Cir. No. 1218981
malopez@littler.com
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY 10022
Telephone: 212.583.2595

James M. Witz, First Cir. No. 1218980
jwitz@littler.com
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone: 312.795.3246

Melissa L. McDonagh, First Cir. No. 1196996
mmcdonagh@littler.com
LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, MA 02110
Telephone: 617.378.6000
Facsimile:  617.737.0052

Dated: November 13, 2025

## RULE 32(G) CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(C) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 5,864 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

/s/ Miguel A. Lopez
Miguel A. Lopez, First Cir. No. 1218981

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following counsel of record for Defendants-Appellees are registered ECF Filers and will be served by the CM/ECF system:

Kimberly A. Alley
Ruberto, Israel & Weiner, P.C.
255 State Street, 7th Flr.
Boston, MA 02109
kaa@riw.com

Meghan K. Daley
Winget, Spadafora & Schwartzberg, LLP
2187 Atlantic Street, Suite 701
Stamford, CT 06902
daley.m@wssllp.com

/s/ Miguel A. Lopez
Miguel A. Lopez, First Cir. No. 1218981